VILLAGE OF VALPARAISO V. ANNA DONOVAN.

[FILED DECEMBER 31, 1889.]

1. **Villages :** DEFECTIVE SIDEWALKS: PERSONAL INJURIES. A lady named D. in passing over a defective sidewalk in the village of V., in consequence of the defects in such walk, was tripped and thrown down and sustained injuries whereby she lost the use of her left hand. She brought an action against the village, and having recovered judgment, *held,* that it was fully sustained by the evidence.

ERROR to the district court for Saunders county. Tried below before MARSHALL, J.

*G. W. Simpson,* for plaintiff in error:

Municipal corporations are not insurers against accidents. (*Chicago v. McGiven,* 78 Ill., 352; *Atchison v. Jensen,* 21 Kan., 575.) Injury alone is not a sufficient ground of recovery; it must be shown that the walk was dangerous, and that plaintiff in error had notice. (*City of York v. Spellman,* 19 Neb., 357; *City of Plattsmouth v. Mitchell,* 20 Id., 228.) Defendant in error was guilty of contributory negligence and cannot recover. (*City of Lin-*

*coln v. Walker*, 18 Neb,, 244; *Brown v. Kendall*, 6 Cush. [Mass.], 292; *Murphy v. Deane*, 101 Mass., 455; *Marble v. Russ*, 124 Id., 50.) There are no degrees of negligence as implied by the thirteenth instruction. (*A. & N. R. Co. v. Washburn*, 5 Neb., 120; *City of Lincoln v. Gillilan*, 18 Id., 117; *Ill. R. Co. v. Hetheringtjn*, 83 Ill., 510.)

*S. H. Sornborger*, and *Allen, Robinson & Reed*, contra:

Under secs. 67b and 69, Comp. Stats., the village is liable. (*City of Omaha v. Olmstead*, 5 Neb., 452; *City of Crete v. Childs*, 11 Id., 252; *City of Lincoln v. Walker*, 18 Id., 250; *Same v. Woodward*, 19 Id., 259; *City of York v. Spellman*, Id., 357; *City of Plattsmouth v. Mitchell*, 20 Id., 228; *Nebraska City v. Rathbone*, Id., 228.) The rule as to cities applies to villages. (*Village of Ponca v. Crawford*, 18 Neb., 662; *Village of Orleans v. Perry*, 24 Id., 831; *Pomfrey v. Saratoga Springs*, 11 N. E. Rep. [N. Y.], 45; *Dooley v. Sullivan*, 112 Ind., 451; 14 N. E. Rep., 567; *Beazan v. Mason City*, 58 Ia., 233; 12 N. W. Rep., 279; *Kellogg v. Janesville*, 34 Minn., 132; 24 N. W. Rep., 359.) Contributory negligence which would defeat a recovery must be such as helped to cause the injury. Slight want of diligence as pointed out in the thirteenth instruction will not prevent recovery. (*Cremer v. Portland*, 36 Wis., 92; *Hammond v. Mukwa*, 40 Id., 35; *Otis v. Janesville*, 2 N. W. Rep., 783; *Union Pacific R. Co. v. Henry*, 14 Pac. Rep., 3.)

MAXWELL, J.

The defendant in error sustained a severe injury by falling on a defective sidewalk in the village of Valparaiso, and brought an action to recover damages therefor. The testimony tends to show that in consequence of the injury the defendant in error has lost the use of her left hand. On the trial of the cause the jury returned a verdict for

$1,000, and motion for a new trial having been overruled, judgment was entered on the verdict.

The character of the sidewalk where the injury occurred is described by the witness D. F. Riley, who at that time was the marshal of said village. He testifies:

Q. I will ask you if you were familiar with the condition of the sidewalk that runs along on the south side of block 12, on the north side of Second street, in that town?

A. Block 12, did you say?

Q. Lot 12, block 1, I think—along lot 12, of block 1, in the village of Valparaiso, in this county.

A. Yes, sir; I know where it is.

Q. You knew its condition at that time did you, Mr. Riley?

A. Well, yes.

Q. You may state what its condition was.

A. Well, it was broken up some at that time.

Q. You may state what buildings are along there, right where this sidewalk was, Mr. Riley.

A. Mr. Tighe's billiard hall.

Q. Well, after you leave Mr. Tighe's billiard hall going east, isn't it?

A. Yes, sir.

Q. How was the walk after you left there, and when you came in front of block 12, or lot 12, block 1?

A. The walk in front of block 12 was rather a poor walk.

Q. I will ask you if the walk right there—if there is any kind of a slope to it, or how it was built; when you first come on lot 12, coming from the west to the east, was there a slope or was it level?

A. It sloped down to the level with the ground; the west end of the walk on the lot was raised perhaps a foot or eighteen inches from the level of the ground.

Q. Coming from the west and going east on that walk, that is, on this lot, what is the first building you happen on; is it a blacksmith shop?

A. Blacksmith shop.

Q. Now, how far is it from the door of this blacksmith shop until you strike the line of that lot; that is, until you strike the lot that you have described as that billiard hall; about how far?

A. The walk in front of the billiard hall?

Q. Yes, sir, until you happen on that walk, until you strike the edge of it.

A. Well, from the west side of the door of the blacksmith shop to the walk on the other lot is thirteen feet and some inches, I think.

Q. About thirteen feet and some inches?

A. Yes, sir.

Q. Now, I will ask you as to that one part of this walk, ask you to describe to the jury the condition, as near as you can, of that walk along about the 4th of November, 1887, i. e., that part of the walk we have indicated from the west door of the blacksmith shop until you reach the east end of the billiard hall?

A. Well, it has been broken up in pretty bad shape part of the time.

Q. You say it was broken up?

A. Yes, sir.

Q. How do you mean?

A. Why, the boards were broken and split.

Q. Were there any holes in this walk—you mean by that expression, were there any holes in it?

A. Yes, sir, there were holes in it.

Q. Now, I will ask you, Mr. Riley, of what material was this walk made?

A. It was originally made of fencing boards.

Q. How many stringers were to it?

A. Three stringers.

Q. Did it bear the indication of ever having been repaired?

A. Yes.

Q. You may state how it was repaired and of what material at this time that the indication of the walk showed any repairs; and of what material those repairs had been made.

A. Well, it was repaired with pieces of dry goods boxes, with pieces of old wagon box boards, that is, boards where boxes had been torn up, pieces were in there; the ends broken off, boards in the original walk, the end of the stringers of the walk, a space of about six inches maybe, the ends broke off some of them.

Q. How wide was the walk at this time?

A. In the first place the walk was four feet wide.

Q. Was it still that wide at that time?

A. Some boards were pieces about two feet ten inches, and three feet—somewhere there, just as they happened to get hold of pieces of boards.

Q. How long had the walk been in that condition before the 4th of November, 1887?

Q. Oh, it had been broken up considerably for quite a while before that; I don't know just how long, but it had been some time.

Q. Was it long as a month?

A. Yes, sir, as long as two months.

Q. Who kept that shop there on lot 12—blacksmith's shop?

A. Mr. Wells.

Q. Was he a member of the village board at that time?

A. Yes, sir, he was a member of the board at that time.

Q. Now I will ask you, Mr. Riley, if you, acting as marshal, ever gave notice to any of the other officers of the village as to the condition of the sidewalks, and of this one spot in particular?

A. I spoke to the street commissioner about it; he and I talked about it at different times.

Q. When was that; that was before this accident occurred?

A. Before the accident occurred.

Valparaiso v. Donovan.

Q. Did you ever speak to Mr. Wells, the owner of the shop there?

A. I think Mr. Wells and I had a talk about the condition of the sidewalk there.

Q. You may state if you ever spoke to any other members of the board or village officers. You spoke of the street commissioner and Mr. Wells; now you may state if you ever spoke to any others in regard to this walk.

A. I spoke to Mr. Mosgrove.

Q. What office did he hold?

A. He was one of the town board.

Q. How long before this accident did you speak to him about it, can you recollect?

A. It was along sometime near the time the accident happened.

Q. You may state what you told them in regard to the walk, if you can recollect?

A. I don't know as I could state just exactly.

Q. Well, the substance of it?

A. I informed them that the walk was in bad shape, and ought to be fixed up.

Q. You informed them in a general way that the walk was in a bad shape and ought to be fixed up?

A. Yes, sir.

It will thus be seen that the walk was in a dangerous condition a long time before the accident, and the village authorities had full notice thereof, but made no effort apparently to have the same repaired.

The evidence therefore fully sustains the verdict and we see no error in the instructions.

The judgment is therefore affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.